IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 08-cv-02143-PAB-MJW

GOL TV, INC.,
a Florida corporation,

    Plaintiff,

v.

ECHOSTAR SATELLITE CORPORATION,
a Colorado corporation, and
ECHOSTAR SATELLITE, L.L.C.,
a Colorado limited liability company, n/k/a Dish Network, L.L.C.,

    Defendants.

---

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

---

This contract case comes before the Court on the parties' cross motions for summary judgment [Docket Nos. 53, 55]. The Court's subject-matter jurisdiction is proper under 28 U.S.C. §1332(a) due to complete diversity of the parties, *see* Docket Nos. 68, 69, and an amount in controversy exceeding $75,000, *see* Compl. & Jury Demand [Docket No. 1] ¶¶ 4, 24.

**I. BACKGROUND**

Plaintiff Gol TV, Inc. ("Gol TV") produces television programming that features soccer games and associated subject matter. Gol TV uses distributors, such as defendants Echostar Satellite Corporation and Echostar Satellite, L.L.C. (collectively "Echostar"), to deliver the programming to individual television viewers. To that end, Gol TV and Echostar entered into a contract covering their relationship. While the

contract addresses a number of issues, the portions relevant to the present litigation pertain to Echostar's compensation of Gol TV in exchange for the provision of programming. Specifically, paragraph 5.1.1 of the contract describes the method for calculating Gol TV's compensation:

> An amount derived by multiplying the average Residential Service Subscribers by the applicable monthly per Residential Service Subscriber License Fee (as specified in Exhibit B hereto). The average Residential Service Subscribers for any given reporting month shall be calculated by adding the number of Residential Service Subscribers authorized to receive the Programming Service on the last day of the reporting month and the number of Residential Service Subscribers authorized to receive the Programming Service on the last day of the prior reporting month, and dividing the resulting sum by 2.

Aff. of Kevin Cross [Docket No. 56], ex. A; *see also* Def.'s Mot. for Summ. J. [Docket No. 53] at 3-4.

The agreement between Gol TV and Echostar terminated at noon on August 1, 2008. At the time Gol TV filed its complaint in this action on October 3, 2008, Echostar allegedly was in arrears on the licensing fees due for the programming Gol TV provided between April 2008 and the termination date. Based on this deficiency, Gol TV's complaint asserted a claim for breach of contract and a claim for *quantum meruit* against Echostar. *See* Compl. & Jury Demand at 4-6. Plaintiff now concedes that, following a payment on November 17, 2008, there is no longer a live dispute regarding payments for the period from April 2008 through July 21, 2008. *See* Mot. for Partial Summ. J. [Docket No. 55] ("Pl.'s Mot. for Summ. J.") at 2. Plaintiff also concedes that, in light of the November 17, 2008 payment, its *quantum meruit* claim is moot. *See* Mot. for Partial Summ. J. [Docket No. 55] ("Pl.'s Mot. for Summ. J.") at 1 n.1. Therefore, Gol

2

TV's breach of contract claim regarding compensation for the time period between July 22, 2008 and July 31, 2008 is the only issue still in dispute in this action.

In determining the payment due to Gol TV for these ten days in July 2008, Echostar undertook various calculations, beginning with the application of paragraph 5.1.1. Under paragraph 5.1.1, Echostar first ascertained the number of "Residential Service Subscribers" authorized to receive Gol TV's programming on July 21, 2008, the last day of its prior standard reporting period. That figure was apparently 1,397,520. *See* Aff. of Kevin Cross [Docket No. 56], ex. E. Then, Echostar ascertained the number of "Residential Service Subscribers" authorized to receive Gol TV's programming on August 21, 2008, what would have been the last day of that reporting period. Because Gol TV no longer provided its programming on August 21, 2008, Echostar plugged in "zero" for this figure. Finally, Echostar added the two figures and divided the resulting sum by two, arriving at 698,760.

In calculating the amount due to Gol TV, Echostar also prorated the "monthly per Residential Service Subscriber License Fee" referenced in paragraph 5.1.1. Echostar took that fee, apparently $0.17 per subscriber, divided it by 31, the number of days in July, and multiplied the resulting quotient by ten, the number of days between July 22, 2008 and July 31, 2008. Echostar then multiplied the resulting prorated monthly rate of $0.05484 by the average number of subscribers during the ten-day period, that is, 689,760. Ultimately, based on the calculations described above, Echostar concluded that it owed Gol TV a total of $38,724.42 for the period of July 22, 2008 through July 31, 2008.

On July 6, 2009, Echostar and Gol TV filed cross motions for summary judgment. Echostar seeks summary judgment on Gol TV's breach of contract claim. *See generally* Def.'s Mot. for Summ. J. Gol TV filed a response to this motion [Docket No. 79] to which Echostar replied [Docket No. 86]. Gol TV's motion seeks summary judgment on the question of Echostar's liability under the breach of contract claim, contending that Echostar improperly calculated the payment due for the period between July 22, 2008 and July 31, 2008. *See generally* Pl.'s Mot. for Summ. J. Echostar filed a response to Gol TV's motion [Docket No. 74], to which Gol TV replied [Docket No. 88]. The motions are fully briefed and ripe for disposition by the Court.

## II. ANALYSIS

### A. Legal Standard – Summary Judgment

"In diversity cases like this one, the substantive law of the forum state governs the analysis of the underlying claims, but we are governed by federal law in determining the propriety of . . . summary judgment."[1] *Hill v. Allstate Ins. Co.*, 479 F.3d 735, 739 (10th Cir. 2007) (internal quotation marks omitted). According to Federal Rule of Civil Procedure 56, a court should grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).

---

[1] With both parties assuming the applicability of Colorado law to the substantive claims in this case, the Court obliges. *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

4

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).

As for the evidence a court may consider in the context of a summary judgment motion, only admissible evidence may enter the analysis. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). In viewing the permissible evidence, courts are to make reasonable inferences therefrom in the light most favorable to the nonmoving party. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998). However, where, as here, there are cross motions for summary judgment, the reasonable inferences drawn from affidavits, attached exhibits, and depositions are rendered in the light most favorable to the non-prevailing party. *Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004). Furthermore, "[w]hen the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (internal quotation marks omitted).

## B. Breach of Contract

The elements of a breach of contract claim under Colorado law are: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). The only element at issue in the present case is the third, whether the defendant, Echostar, failed to perform its obligations under the contract in question. The only contract provision which Gol TV accuses Echostar of breaching is paragraph 5.1.1.

An important first step in this dispute is ascertaining the meaning of the contractual language at issue. "Contract interpretation is generally a question of law for the court." *City of Aurora v. ACJ P'ship*, 209 P.3d 1076, 1085 (Colo. 2009). "The primary goal of contract interpretation is to determine and effectuate the intent and reasonable expectations of the parties." *Copper Mountain, Inc. v. Industrial Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009). In determining the parties' reasonable expectations and intent, "the court should give effect to the plain and generally accepted meaning of the contractual language." *Copper Mountain, Inc.*, 208 P.3d at 697. Finally, "[t]he court should interpret a contract in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless." *Copper Mountain, Inc.*, 208 P.3d at 697 (internal quotation marks omitted).

The first interpretive task for the Court is determining the meaning of the phrase "reporting month" in the second sentence of paragraph 5.1.1:

> The average Residential Service Subscribers for any given *reporting month* shall be calculated by adding the number of Residential Service

6

> Subscribers authorized to receive the Programming Service on the last day of the *reporting month* and the number of Residential Service Subscribers authorized to receive the Programming Service on the last day of the prior *reporting month*, and dividing the resulting sum by 2.

Aff. of Kevin Cross [Docket No. 56], ex. A (emphasis added). The contract itself does not define the term "reporting month." Both parties argue that the term is unambiguous, but disagree about its meaning. Gol TV argues that "reporting month" essentially means "reporting period," which may be shorter in duration than an actual month. Echostar, on the other hand, urges the Court to find that "reporting month" means from the twenty-second day of one month to the twenty-first day of the next month, the standard time period employed during the vast majority of the term of the contract.

Like the interpretation of a contract more generally, the issue of whether a contract is ambiguous is also decided as a question of law for the court. *East Ridge of Fort Collins v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005). "A contract is ambiguous when it is reasonably susceptible to more than one meaning." *Public Serv. Co. of Colo. v. Meadow Island Ditch Co. No. 2*, 132 P.3d 333, 339 (Colo. 2006). "In determining whether a provision in a contract is ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meanings of the words used, and reference must be made to all the agreement's provisions." *Lake Durango Water Co., Inc. v. Public Utilities Comm'n*, 67 P.3d 12, 20 (Colo. 2003). Furthermore, as exemplified by the present case, "[a] mere disagreement between the parties as to the interpretation of an agreement does not in itself create an ambiguity as a matter of law." *City of Aurora v. ACJ P'ship*, 209 P.3d 1076, 1085 (Colo. 2009).

I conclude that, in the context of the agreement as a whole, and for purposes of the present controversy, the term "reporting month" is not ambiguous. I also conclude that neither of the parties' proffered interpretations is persuasive. Contrary to Gol TV's position, "reporting month" does not mean any reporting period, even one that is less than approximately thirty days. There is also no reason to adopt Echostar's interpretation of the phrase to mean a specific start and end date. Rather, the term unambiguously indicates that the calculation will account for an approximately thirty-day period, a period that is not tied to any particular start and end date. While the contract is ambiguous as to what the exact start and end dates would be or how they would be determined, this fact is irrelevant to the present controversy and the Court does not need to address it. It is sufficient in the present context to conclude, as a matter of law, that "reporting month" does not mean a time period less than thirty days long and does not require a specific start and end date.

The undisputed evidence establishes that, for the vast majority of their contractual relationship, the parties operated under a "reporting month" that ran from the twenty-second of one month to the twenty-first of the next month. Indeed, that is the reason that the time period still at issue in this case begins on July 22, 2008. Consequently, the "reporting month" at issue here began on July 22, 2008 and ended on August 21, 2008. Moreover, under the plain terms of paragraph 5.1.1 of the contract, "[t]he average Residential Service Subscribers for [this] reporting month shall be calculated by adding the number of Residential Service Subscribers authorized to receive the Programming Service on [August 21, 2008] and the number of Residential

8

Service Subscribers authorized to receive the Programming Service on [July 21, 2008], and dividing the resulting sum by 2."

Echostar correctly inputted "zero" as the former figure and correctly calculated that the average number of relevant subscribers for that calendar month was 689,760. That being said, Echostar's calculation went awry where, in addition to discounting the license fee through the paragraph 5.1.1 equation, it also prorated the applicable monthly per Residential Service Subscriber License Fee. Paragraph 5.1.1 says nothing about such a proration. Echostar claims instead that the description of the license fee as a "monthly" fee portends such an adjustment. I disagree, particularly in light of the Court's interpretation of paragraph 5.1.1, which calculates the number of subscribers and the resulting license fee based upon a "reporting month" even when programming was not provided for a full month. Assuming a proration of the fee without similarly adjusting the "reporting month" would be impermissibly inconsistent. *Cf. Copper Mountain, Inc.*, 208 P.3d at 700 ("We choose a construction of the contract that harmonizes provisions instead of rendering them superfluous.").

Echostar also argues that the Court should allow such a proration because Gol TV accepted prorated payments in the past when first starting the payments and when rate changes went into effect in the middle of a reporting month. *See* Reply in Supp. of Defs.' Mot. for Summ. J. [Docket No. 86] at 10 n.4; Defs.' Resp. in Opp'n to Pl.'s Mot. for Partial Summ. J. [Docket No. 74] at 8 n.4. However, Echostar does not suggest that any prior proration was combined with the additional discount effected by inputting "zero" subscribers into the equation for determining the average number of subscribers. *See, e.g.*, Aff. of Stewart McNab [Docket No. 58], ex. G [Docket No. 58-3] (billing

statement for a purportedly "prorated" month, which does not include a zero in either of the subscriber counts). Furthermore, proration appears to be the more appropriate approach where, as was the case on most of the occasions described in the briefing, the input being changed mid-month is the applicable license fee. On the other hand, where the input being changed mid-month is the number of subscribers, the calculation described above is the more appropriate choice under the contract language.[2] Only where both the license fee and the number of subscribers change in the middle of a reporting month, however, would both adjustments be proper. That is not the situation here and, therefore, Echostar's attempt at doubly discounting the payment due to Gol TV was improper under the contract.

Gol TV argues that the discount method adopted by the Court may lead to inequitable results. See Pl.'s Mot. for Summ. J. at 17-19. The reason for this is that the contract essentially establishes a proxy for every partial month of service. That proxy is the rough equivalent of a half-month of service. By inputting "zero" as the closing number of a reporting month, the ultimate division by two at the end of the equation will always work to make the average number of subscribers half of the starting number. Admittedly this is a rough estimation of the number of actual subscribers who had

---

[2] Admittedly, at the commencement of the contract term, in order to accommodate a partial month of service, Echostar appears to have used the proration approach rather than the calculation described in paragraph 5.1.1 and employed by the Court here. See Aff. of Stewart McNab [Docket No. 58], ex. G [Docket No. 58-3]. However, no dispute existed at that time and no party attempted to enforce the terms of the contract. Therefore, the Court's interpretation of the plain language of the contract will not be affected by the fact that the parties willingly departed from it on one occasion in the past.

access to a producer's programming during that partial reporting month of service. Gol TV is correct that where a programming provider ceases its programming on the twentieth day of a calendar month – in other words on the twenty-ninth day of the typical reporting month – it will not be compensated for approximately fourteen days of service. However, Gol TV fails to recognize that the opposite is also true; where a programming provider ceases its programming after the first day of a reporting month, it will be compensated for approximately fourteen days of service it never provided. In the present case, Gol TV falls into this latter category; under the terms of paragraph 5.1.1, Gol TV will be compensated for essentially fifteen days of programming when it only provided ten.

To the extent that either party receives a "windfall," that gain was contemplated by the contract. In forming the contract, the parties opted for ease of calculation over accuracy. This is apparent in the compensation calculation in paragraph 5.1.1 for full months. Rather than precisely calculating the actual number of subscribers, the parties chose to select two somewhat arbitrary points in time, average the actual subscribers on those dates, and assume that the resulting figure represents a fair approximation of the actual subscribers over the entire period. The calculation for partial reporting months embodies a similar compromise, sacrificing accuracy for efficiency.

Whether the method selected by the parties in the contract is the most prudent way to calculate license fees is not for the Court to decide, for "[p]arties to a contract . . . may agree on whatever terms they see fit so long as such terms do not violate statutory prohibitions or public policy." *Fox v. I-10, Ltd.*, 957 P.2d 1018, 1022 (Colo. 1998). "The court's duty is to interpret and enforce contracts as written between the

parties, not to rewrite or restructure them." Fox, 957 P.2d at 1022. Therefore, the Court will enforce the plain language of the contract in this case and honor the parties' agreed-upon method for calculating license fees for partial reporting months.

## III. CONCLUSION

In conclusion, there is no genuine issue as to any material fact regarding Echostar's liability under Gol TV's breach of contract claim. Under the undisputed facts of this case, and as a matter of law, Echostar has improperly calculated the license fee due to Gol TV for the period between July 22, 2008 and July 31, 2008. As a result, Echostar has not compensated Gol TV to the full extent to which Gol TV is entitled under the terms of the contract. Thus, Echostar has breached the agreement and Gol TV is entitled to partial or "interlocutory" summary judgment on the issue of Echostar's liability under Gol TV's breach of contract claim. *See* Fed. R. Civ. P. 56(d)(2) ("An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages.").

Accordingly, it is

**ORDERED** that defendants Echostar Satellite Corporation and Echostar Satellite, L.L.C.'s motion for summary judgment [Docket No. 53] is DENIED. It is further

**ORDERED** that plaintiff Gol TV, Inc.'s motion for partial summary judgment [Docket No. 55] is GRANTED. Plaintiff is entitled to partial, interlocutory summary judgment on the issue of Echostar's liability under Gol TV, Inc.'s breach of contract claim. It is further

**ORDERED** that, because the issue of damages remains to be decided in this case, no final judgment shall enter at this time. Any Final Judgment entered upon resolution of the damages issue shall include judgment in favor of plaintiff Gol TV, Inc. and against defendants Echostar Satellite Corporation and Echostar Satellite, L.L.C. on the issue of liability under Gol TV, Inc.'s breach of contract claim.

DATED March 29, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge